LORD'S & LADY'S ENTERPRISES, INC., & others[1] *vs.* JOHN PAUL
MITCHELL SYSTEMS.

No. 96-P-1659.

Suffolk. April 9, 1998. - February 2, 1999.

Present: BROWN, PERRETTA, & KASS, JJ.

*Damages,* Breach of contract, Nominal damages. *Practice, Civil,* Instructions
to jury, Failure to make objection. *Contract,* Performance and breach,
Consideration.

At the trial of a claim for breach of contract, there was no error in the judge's
instructions on damages, to which, in any event, the plaintiffs made no
objection. [266-268]
At the trial of a claim for breach of contract, the judge correctly denied the
defendant's motions for directed verdict and judgment notwithstanding the
verdict. [268]
Based on the evidence presented at the trial of a claim for breach of contract,
the judge should have allowed the defendant's motion to alter or amend
the judgment to provide for an award of only nominal damages. [268-270]

CIVIL ACTION commenced in the Superior Court Department on
June 10, 1993.

The case was tried before *Martha B. Sosman,* J.

*Edwin A. McCabe* for the plaintiffs.

*Anthony M. Doniger* for the defendant.

. PERRETTA, J. This controversy arises out of the efforts of
Michael M. Barsamian, president of Lord's & Lady's Enter-
prises, Inc. (L&L), to create a mail-order catalogue through
which professional hair-care products, including those of John
Paul Mitchell Systems (JPMS), could be sold. Believing that he
had the approval of JPMS to include its products in the
catalogue, Barsamian published the catalogue and conducted a

[1]Michael M. Barsamian, Catherine E. Barsamian, Barsamian Enterprises,
Inc., Lord's & Lady's Catalog, Inc., L&L Walpole, Inc., and Lord's & Lady's
Hair Salon, Inc.

test mailing. After the initial mailing, JPMS refused to allow its products to be sold through the catalogue. L&L then brought this action against JPMS for breach of contract, and the jury, in response to special questions, found that L&L was entitled to compensatory damages in the amount of $15,000. On these cross appeals, the parties raise various issues, all concerning the amount of the award. Concluding that L&L is entitled to nominal damages only, we amend the judgment and, as amended, affirm.

1. *The evidence.* When Barsamian decided to create a mail-order catalogue, he sent identical letters to major manufacturers and distributors of professional hair-care products, soliciting their participation in the catalogue. He proposed to purchase the products offered for sale from the participants' local authorized representatives and to accept mail or telephone orders from the catalogue at the L&L salon in West Roxbury. Of those solicited, Sebastian, Nexxus, KMS, and JPMS agreed to have their products offered through the catalogue. L&L's own product line was to be included.

Robert J. Terkanian, president of Hair-Lines, Incorporated (Hair-Lines), the exclusive distributor of JPMS products in Massachusetts and Rhode Island, received a letter of solicitation on May 6, 1991. In response to the letter, he informed Barsamian that he could not authorize approval of the inclusion of JPMS products in the catalogue and that Barsamian should contact the vice-president of JPMS's northeast region, Veny Musum. Barsamian wrote to Musum on July 17, 1991, explaining his wish to include JPMS products in the catalogue. Although the testimony on the next point is somewhat confusing, the jury could have found that Barsamian received a letter dated August 20, 1991, from Terkanian in which he stated that Musum and the chief executive officer of JPMS, John Paul De-Joria, had authorized the inclusion of JPMS products in the catalogue.

Based upon the approval of the various manufacturers who had been solicited, Barsamian produced the catalogue and conducted a test mailing. The response rate, .0017%, was far less than anticipated.

Meanwhile, in June, 1992, the chief operating officer and legal counsel for JPMS, Michaeline Re, learned of the catalogue and the sale of JPMS products by mail and telephone orders, and she took action. It was JPMS's policy that its products be sold only through hair salons. She wrote to Barsamian and

ordered him to stop selling JPMS products through the catalogue. She also advised Terkanian of her action. When Re discovered that DeJoria apparently had approved inclusion of JPMS products in the catalogue, she agreed to authorize L&L to continue selling its products through the catalogue but only in Massachusetts and Rhode Island and only through December, 1992. Barsamian refused Re's offer and, faced with the loss of JPMS offerings, aborted the catalogue venture. Although Barsamian testified that he never would have gone forward with the catalogue venture without JPMS's participation, he acknowledged that he never made JPMS aware of that fact.

There was also evidence that L&L's out-of-pocket expenditures for the failed project totaled $142,000. As for lost profits, one of L&L's two expert witnesses testified that, even had JPMS allowed its products to remain in the catalogue, L&L nonetheless would have lost substantial sums of money for at least three years.[2] This expert stated that his projections were based upon an assumption made by L&L's second expert witness, namely, that had L&L continued with the catalogue mailings, the average customer would have spent fifty dollars per order the first year, fifty-five dollars the second, and sixty dollars the third. Both experts agreed that if this assumption was overly optimistic, L&L's losses would have continued beyond the first two years of the venture.[3]

2. *The special verdict and jury instructions.* Pursuant to Mass. R.Civ.P. 49(a), 365 Mass. 812 (1974), the trial judge prepared five questions (to which counsel agreed) for the jury: "1. Was there a contract between [JPMS] and any of the plaintiffs? 2. Did [JPMS] breach the contract with plaintiffs? 3. Did [JPMS] make any promise to the plaintiffs that they reasonably relied upon to their detriment? 4. Did plaintiffs suffer any damage as a result of [JPMS's] breach of contract or as a result of plaintiffs' reliance on [JPMS's] promise? 5. What amount of money would fairly and reasonably compensate plaintiffs for damages

[2]More specifically, one expert testified that L&L would have a net loss of $118,669 the first year and an additional loss of $67,996 in the second year. These losses exceeded anticipated earnings for the third year, $108,624, by $78,041.

[3]There were additional assumptions upon which L&L's experts based their opinions: for the catalogue to be successful, L&L would have to expand its length from eight to thirty-two pages, feature 250 products, and have six mailings per year with each mailing in a "substantially remerchandised" format.

sustained as a result of [JPMS's] breach of contract or as a result of plaintiffs' reliance on [JPMS's] promise?"

After instructing the jury on the elements of an action for breach of contract, the trial judge explained that L&L was not claiming that JPMS expressly agreed to participate in the catalogue for any particular period or for any particular number of catalogues. She then instructed: "When a contract does not specify any particular duration or any particular time, the law says that either side may terminate that contract, but they can only do so upon giving the other side reasonable notice. What is reasonable notice depends upon all the circumstances surrounding that particular contract." The trial judge concluded her explanation of the concept of "reasonable notice" by instructing the jury that if they found that JPMS had entered into a contract with L&L but terminated the contract on something less than reasonable notice, that termination would constitute a breach; however, terminating any contract found to exist upon reasonable notice would not be a breach.

Turning to question three, the trial judge informed the jury that L&L was also proceeding on the alternative theory of promissory estoppel. She told them that "[w]hat that means is, in the absence of a full, proper and enforceable contract there are circumstances where the law will still impose liability for breaking or not adhering to your promises." The controlling circumstances were identified as: "If someone makes a promise to another person where they should reasonably expect that the other person will rely on that promise, . . . and the person is injured as a result of their reliance on that promise, then the person can be bound to that promise in order to avoid an unjust result." She concluded the instruction on question three with: "If . . . [you find] that [JPMS] made a promise to the plaintiffs, reasonably expecting that plaintiffs would rely on it; that the plaintiffs did rely on it to their detriment, that is, that they were injured or damaged in some fashion as a result . . . you should check yes in response to question three."

We set out the highlights of the instructions given in respect to question four, damages:

> "The purpose of a damages award in either a breach of contract case or a case of promissory estoppel, the purpose is to put the plaintiff . . . as best money damages can do . . . back in the position they would have been in if the

contract or the promise had been fulfilled by both sides according to its terms. That is, what position, for purposes of this case, what position would the [L&L] catalogue have been in if [JPMS's] termination had been on reasonable notice with [L&L] itself, abiding by all the terms of the contract."

* * *

"There are two categories of damages that have been claimed here, and we are asking, if you reach this question, to set them out and analyze them separately. The first category is what we call compensatory damages. That would be out-of-pocket damages, out-of-pocket expenses. Amounts that were expended on the catalogue. It's for you to determine what was really expended. If they were expended and if they would have been recovered or some amount of them would have been recovered, if [JPMS] had stayed in the catalogue for a reasonable time, had not terminated except on reasonable notice, then [L&L] would be entitled to get that money back. . . . The second category is lost profits. That is . . . the profits that would have been earned if [JPMS] had given reasonable notice of any intent to terminate. It's the profits that would have been earned during that time."

In response to the questions, the jury found that there had been a contract between L&L and JPMS, that JPMS was in breach of that contract, and that L&L was entitled to compensatory damages in the amount of $15,082.75, but nothing for lost profits.[4]

3. *L&L's appeal.* L&L first argues that the trial judge failed to instruct the jury that they could award "reliance" damages for breach of contract, that is, damages placing L&L in as good a position as if it and JPMS had never entered into the contract.

It is arguable whether L&L preserved its right to present this issue on appeal. L&L made no objection to the special questions put to the jury and, as we read L&L's requests for jury instructions, the trial judge instructed as requested.[5] Passing

---

[4]The jury also found that JPMS made no promise to L&L upon which it reasonably relied to its detriment. That finding could reasonably be viewed as consistent with the trial judge's instruction that promissory estoppel was a theory of recovery alternative to breach of contract.

[5]L&L requested only that the jury be instructed on promissory estoppel and

over the question whether L&L preserved its right of review of the trial judge's so-called failure to instruct on "reliance" damages, we think any error, and we see none, would be harmless. The instructions on damages essentially allowed the jury to make an award that would place L&L in as good a position as if no contract had existed. See *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. 610, 611 n.2 (1994), commenting upon "reliance" damages.[6]

L&L next complains that the trial judge tied L&L's damage claims to the period during which any notice of termination by JPMS would not be reasonable, without also explaining to the jury that they were to consider and define the duration of that reasonable period. Not only is this claim directly refuted by the trial judge's instructions on the issue of reasonable notice, it also fails for lack of a proper objection. See *Lysak* v. *Seiler Corp.*, 415 Mass. 625, 629-630 (1993) (objection to instruction concerning defense against claim of discrimination insufficient to preserve for appeal a claim of error in instruction concerning appropriate burden of proof once discrimination found); *Waltham Truck Equip. Corp.* v. *Massachusetts Equip. Co.*, 7 Mass. App. Ct. 580, 585 (1979) (objection to one instruction will not overcome waiver on an unchallenged instruction).

that those damages which could be awarded under this theory of liability "include out-of-pocket damages and lost profits, if such profits were foreseeable." As can be seen from the trial judge's instructions, the jury was told that the purpose of damages, out-of-pocket and lost profits, under either theory of recovery, breach of contract or promissory estoppel, was to put the plaintiff back in the position it would have been in had the contract or the promise been fulfilled.

[6]There the court noted: "The long-established general rule for breach of contract recovery in Massachusetts is that the wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if the contract had been performed. *John Hetherington & Sons, Ltd.* v. *William Firth Co.*, 210 Mass. 8, 21 (1911). However, in an appropriate case, Massachusetts law permits, as an alternative to such 'expectation' damages, the recovery of 'reliance' damages, i.e., expenditures made in reliance upon a contractual obligation that was not performed. See *Albre Marble & Tile Co.* v. *John Bowen Co.*, 338 Mass. 394, 398-399 (1959); *Brennan* v. *Carvel Corp.*, 929 F.2d 801, 810-811 (1st Cir. 1991); Restatement (Second) of Contracts § 349 (1981). Such a measure of damages, which is designed to place a plaintiff 'in as good a position as he would have been in had the contract not been made,' *Hastoupis* v. *Gargas*, 9 Mass. App. Ct. 27, 35 n.6 (1980), is essentially similar to the tort standard of actual, or out-of-pocket, loss proximately suffered. See Nolan & Sartorio, Tort Law § 146 (1989). Cf. *Sullivan* v. *O'Connor*, 363 Mass. 579, 583-586 & n.5 (1973)."

Although L&L lodged an objection on this point, it limited the objection to the instruction as it pertained to the theory of promissory estoppel while agreeing that the instruction was correct "under the contract analysis." The jury's finding on question three, that JPMS made no promise to L&L upon which it reasonably relied to its detriment, makes the argument irrelevant.

4. *JPMS's cross appeal.* JPMS first contends that it was error to deny its motions for a directed verdict and judgment notwithstanding the verdict on the breach of contract claim. It argues that L&L promised JPMS nothing in exchange for JPMS's permission to include its products in the catalogue and that any contract action must fail for want of consideration. See, e.g., *Gill* v. *Richmond Co-op. Assn., Inc.,* 309 Mass. 73, 80 (1941).

We see no error in the denial of the motions. There was evidence to show that JPMS agreed to allow L&L to include its products in the catalogue, that L&L promised it would promote JPMS products subject to certain conditions imposed by JPMS,[7] and that L&L and JPMS each anticipated a financial benefit from the agreement. See *Quinn* v. *State Ethics Commn.,* 401 Mass. 210, 216 (1987); *Fall River Hous. Joint Tenants Council, Inc.* v. *Fall River Hous. Authy.,* 15 Mass. App. Ct. 992, 993-994 (1983), and cases and authorities therein cited.

Relying upon the testimony of L&L's expert witnesses, JPMS next argues that its motion to alter or amend the judgment to provide for an award of nominal damages should have been allowed. See *Page* v. *New England Tel. & Tel. Co.,* 383 Mass. 250, 251 (1981); *Spring* v. *Geriatric Authy. of Holyoke,* 394 Mass. 274, 289-290 (1985). Because the jury found on the evidence that L&L was not entitled to damages for lost profits, we are only concerned with out-of-pocket expenses, that is, those expenses incurred by L&L in reliance upon its contract with JPMS. As explained in *DPJ Co. Ltd. Partnership* v. *Federal Deposit Ins. Corp.,* 30 F.3d 247, 249 (1st Cir. 1994), quoting, with emphasis, from Farnsworth, Contracts § 12.16, at 262 (1990):

[7]Those conditions were (1) that all JPMS products would be purchased from its exclusive distributor, Hair-Lines; (2) that L&L would grant Hair-Lines access to L&L warehouse locations for purposes of taking inventories of JPMS products; (3) that L&L would make available to JPMS the demographic results of the catalogue mailings; (4) that L&L would mail its catalogues only to those areas where L&L salons were located; and (5) that L&L would sell JPMS products at the suggested retail list price.

"[W]here an injured claimant cannot recover the full benefit of the bargain — for example, because profits cannot be proved with sufficient certainty — there is an alternative, well-established contract damage theory: '[O]ne who fails to meet the burden of proving prospective profits is not necessarily relegated to nominal damages. If one has relied on the contract, one can usually meet the burden of proving with sufficient certainty the extent of that reliance . . . . One can then recover *damages based on reliance*, with deductions for any benefit received through salvage or otherwise.' "

See *Air Technology Corp.* v. *General Elec. Co.*, 347 Mass. 613, 628-629 & n.19 (1964); *VMark Software, Inc.* v. *EMC Corp.*, 37 Mass. App. Ct. at 611 n.2. That the jury found, in response to question three, that JPMS made no promise to L&L upon which it reasonably relied to its detriment is of no consequence. That finding was made in respect to an alternative theory of liability, promissory estoppel, and it does not preclude a plaintiff's recovery of damages for expenditures made in reliance upon a contract which a defendant then fails to perform. See note 6, *supra.*

There are, however, undisputed facts in the evidence which we conclude do preclude L&L from recovering out-of-pocket damages from JPMS. The first is based upon the principle that "[d]amages measured by reliance may . . . be denied if the party in breach did not have reason at the time the contract was made to foresee them as a probable result of the breach." Farnsworth, Contracts § 12.16, at 278 (2d ed. 1998). According to Barsamian's own testimony, he informed JPMS that he had been authorized by other hair-product manufacturers and distributors to include their products in the catalogue and that he "really want[ed] Paul Mitchell included in this venture." However, he never told JPMS that he would not go forward with the catalogue without its participation. Based upon Barsamian's uncontradicted testimony, we do not think it possible to draw a reasonable inference that, at the time L&L and JPMS entered into the contract, it was reasonably foreseeable to JPMS that its participation was central to Barsamian's decision whether or not to launch the venture. See *International Totalizing Sys., Inc.* v. *PepsiCo, Inc.*, 29 Mass. App. Ct. 424, 430 (1990).

Of even greater significance is the recognized principle that, "where full performance of a contract would have given claimant no benefit, or at least less than the reliance damages claimed, this fact may justify limiting or disallowing reliance damages. The notion is that claimant should on no account get more than would have accrued if the contract had been performed." *DPJ Co. Ltd. Partnership* v. *Federal Deposit Ins. Corp.*, 30 F.3d at 250. See Farnsworth, Contracts § 12.16, at 279.[8] The testimony given by L&L's expert witnesses, fraught as it was with speculative assumptions (see note 3, *supra*), shows that L&L would not have even begun to earn profits and recover its expenses until after three years of JPMS participation in the venture. See note 2, *supra*. Because the contract found to exist by the jury between L&L and JPMS did not specify any duration, the contract "might fairly be construed as one 'terminable at will by either party upon reasonable notice.'" *Simons* v. *American Dry Ginger Ale Co.*, 335 Mass. 521, 524-525 (1957). Cf. G. L. c. 106, § 2-309. Although we agree that the six-month notice given by JPMS was not reasonable, we also conclude that, as matter of law, JPMS could not be held to the contract for a period of three or more years. See *Plymouth Port, Inc.* v. *Smith*, 26 Mass. App. Ct. 572, 575-576 (1988).[9]

5. *Conclusion.* The order denying John Paul Mitchell Systems's motion to alter or amend the judgment is reversed. The judgment is to be modified by striking out the award of damages in the amount of $15,082.75 and replacing it with a nominal award in the amount of $1.00. As so modified, the judgment is affirmed.

*So ordered.*

---

[8]See also Restatement (Second) of Contracts § 349 (1981) ("[T]he injured party has a right to damages based on his reliance interest, including expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed").

[9]As also explained in *DPJ Co. Ltd. Partnership* v. *Federal Deposit Ins. Corp.*, 30 F.3d at 250, reliance damages are limited to expenditures incurred *after* formation of the contract. Neither party to these cross appeals has provided us with any references to the record, which exceeds 1,300 pages, whereby the amount of expenditures made after the formation of the contract could be ascertained with any degree of accuracy. See Mass.R.A.P. 16(e), as amended, 378 Mass. 940 (1979). We, therefore, do not discuss this additional limitation upon a recovery of out-of-pocket expenses.